CHARLES J. SCHUCK, Judge.
This is á joiáí hlaim filed'by James E. Brown in his own right and James E. ¿own as the "administrator of the estate of Roxie M, Brown, deceased, in which the joint claim as presented asks for Remuneration in the sum of $15,000.00 by reason of an accidefit occurring on route 60 near Cedar Grove in Kanawha couhty, West Virginia, on the 17th day of March 1932. tvs
It appears ttíáíf James E. Brown, who had been employed by the state road 'commission for some time previous to the accident, was driving with his wife in an automobile between seven-thirty anc?-eight o’clock on the evening of March 17, 1932, and on th^f said route 60, from a grocery store at Cedar Grove to his lióme located in Shrewsbury; that while driving on said highway^s aforesaid and while passing a certain point oii said highwa^ Aear a. deep cut in the mountainside, a boulder, estimated as weighing from sixty to seventy tons, slid or fell from the said mountainside crushing the claimant’s automobile, causing injuries to the claimant’s wife, from which she died several hours afterwards, and causing him severe and critical injuries 'necessitating his confinement in the hospital at Montgomery ’for a period of one month, and subsequent treatment und^r:, the care of the physician in charge of said Hospital for a period of one month, and subsequent treatment iindeÁ the care^ pf thc^ physicianjjin charge of said hospital for a periocl of aBouf eleven moñths thereafter. By the said accident the claimant, Brown, sustained, among other injuries, a *4 compound fracture of the skull, the fracture of several ribs, a hemorrhage in the left lung, a hemorrhage in the knee cap of the left leg, which leg was badly crushed, the tearing of the ligaments of the said leg, and other injuries, all of which tended to put the said claimant in a critical condition as shown by the testimony of the physician in attendance. To these claims the state road commission maintains that the falling of the rock, or boulder, was not occasioned by the negligence or lack of reasonable care on the part of the said road deportment, or any of its duly appointed employees or servants, and could therefore be attributed to an' act of God.
This then is the question that concerns us at the very outset of the consideration of this record in detamining whether or not the claimants are entitled to any award,
A careful reading of the record of the bm» shows that the rock in question was suspended at the height of some ten or twelve feet above route 60 on a grade or cut wfafch was inclined approximately forty-five degrees, in a shale foKSiation and that the road commission was called upon frequently, previous to die time of the accident, to clear a ditch which had been constructed beside the highway and some three «r four feet therefrom and which ditch, about three feet in width and from twelve to eighteen indies in depth, ran alongf the toe or fool of the embankment, cut or mountainside, on which the said rock or boulder was lodged or suspended. (Record pp., 79— 86, Peters 99-103, Shaffer 120-124). The teattmony tends to show further that several employees of the stale road commis-. sion considered the rock dangerous and hazardous to persons, using the highway in question, and that on one occasion at least, as shown by the testimony (record fpi 73-98) of the witness, P. H. Hackney, a former road comminioner employee In charge of equipment, he called the attention of the maintenance foreman employed by the state road emmission to the hazardous condition surrounding the suspension of the rock or boulder on the mountainside in question. "Shis witness, as shown by the record in page 95, considered the» rock dangerous and especially so in view of the type of formation upon which *5 it was sitting or lodged, which formation was of a shale composition and in the judgment of the said witness constantly sliding and slipping and undermining the foundation of the rock in question. The opinion of this witness is supported by other' witnesses working for the commission at the time of the accident and at the place where the accident occurred. See the testimony of the witnesses Peters and Shaffer already referred to. C. B. Holsclaw, a licensed and qualified civil engineer, and acquainted with the geological formation of the mountainside where the accident happened and who had worked at that particular place and taken cross sections of the hill in question, gave it as his opinion that the cutting away of the toe of the hill caused the boulder or rock to slip onto the said highway. (See record pp. 134-144). The record otherwise shows that employees engaged in their work at the time and place where the accident happened appreciated the hazardous and dangerous condition that existed and frequently discussed the matter among themselves, all of which tended to show that the position of the rock and the formation upon which it rested were of such a type and character as in their judgment to make it highly dangerous to pedestrians and persons passing along or using the said highway at the place where the accident happened.
Under these circumstances and testimony, which seem to be uncontradicted, can the falling or slide of the rock or boulder be attributed to an act of God? We understand an act of God to be a direct, violent, sudden and irresistible act of nature which could not by any reasonable care have been foreseen or resisted.
There was, of course, so far as the record reveals, no direct, violent, sudden or irresistible act of nature, but on the other hand several witnesses have testified, as shown by the record, that there was an almost constant crumbling of the shale formation which was the foundation upon which this rock rested and which crumbling frequently filled the ditch in question with shale, stone and dirt and frequently required the attention of the state road commission or its employees in keeping the said ditch clean in order that the water might be properly *6 drained from the said mountainside and carried to One Mile creek a short distance away. The hazardous and dangerous condition of the rock, as shown by the record, was appreciated by several of the witnesses who have testified, as shown by the testimony of Charles Shaffer, a former road employee (record pp. 119 to 127) ; the employees were familiar with the condition presented; that it was a shale formation; that the rock was loose; that in February, 1932, a month before the accident, the ditch in question had again been cleaned immediately under the rock, all of which cleaning and clearing of debris in the ditch had tended to undermine the foundation causing it to slide and fall onto the highway.
In view of this and similar testimony there could be no sudden or irresistible act of nature which would cause the accident and which could not have been avoided by the use of reasonable care on the part of the department in question in removing the said rock and thus eliminating the danger to those passing along the highway at the place where the accident happened.
We are of the opinion in this connection that the testimony and evidence as revealed by the record shows conclusively and without contradiction that the accident was caused by the failure to remove this rock or boulder when it was known to be hazardous and dangerous, and when by reason of the constant falling of the shale and soil foundation it was liable at any moment to fall or slide into and upon said highway and cause damage or injury to anyone who might be passing at the time of said slide or fall. Having disposed of this question the next and important feature of the claim is as to the amount that is to be awarded the claimants for the loss and damage they may have sustained.
As already indicated the claimant, James E. Brown, was critically injured and required medical attention both in the hospital and out of it for a year after the time of the accident, while his wife, who was riding with him at the time, died within a few hours after the accident by'reason oí the injuries received.
*7 It is true that the road commission employed the claimant, Brown, for some five or six years from and after the spring of 1933 for which he (Brown) was paid approximately $4,800.00, and it is likewise true that at a session of the state Legislature, 1934, the amount of $569.70 was awarded the claimant, Brown, to pay for his wife’s funeral expenses as well as hospital and medical care, and medicine which was required in his own treatment. At least so far as the record reveals this was the distribution made of the amount appropriated by the Legislature. In making our award we have, of course, considered these matters.
The testimony shows that Brown was paid the usual wages of those of his own class at so much per hour for the hours worked and that he rendered services for the amount received during his employment by the road commission from 1933 to the time of his dismissal therefrom. It also appears that on several occasions the claimant, Brown, has appealed to the Legislature for remedial legislation in the shape and form of an appropriation which would compensate him for the loss of his wife and the injuries sustained by himself, and that ih each instance, except the amount which has already been herein set forth, the Legislature refused any further award. Since these applications, however, the claimant, Brown, has had his leg amputated, which operation took place ih March 1941 (being the present year). Both Dr. Stallard, the physician who first attended him immediately after the accident and who continued his services for nearly a year thereafter, and Dr. Claude B. Smith, the doctor who performed the actual amputation, testified, as shown by the (record pp. 52 to 58 and 104 to 107) that the amputation was occasioned and made necessary by reason of the injuries following the accident; however, an ulcer which had been present on the leg in question of the claimant before the time of the accident, superimposed itself and the condition of the said ulcer aided in bringing about the necessity for the amputation. What percentage or what division of responsibility may be attached to these various physical conditions is not shown by the record and we can simply make our own deductions as to the part that was played by The pres *8 ence of the ulcer in causing the amputation. We are of the opinion, however, that the ulcer, which seemed to be aggravated, progressive, in its nature, was of the class that would become serious to the health of the said claimant and no doubt contributed in a large degree to bringing about the physical condition which necessitated the amputation of the leg. For this condition and situation, of course, the state road commission would not be responsible. However, the condition of the claimant’s skull is such that headaches are frequent and he bears a large indentation on the forehead which the physicians in charge testified he would always have and which was caused by the operation necessary to relieve the pressure on the brain and the brain tissues caused by the injuries in question. Another element that enters into the matter of the amount of the award is the fact that the testimony shows (record at page 70) that the automobile in which the claimant and his wife were riding at the time of the accident was completely demolished and that it was worth about twenty to fifty dollars as junk when turned into the automobile repair agency shortly after the accident. The automobile had cost $517.00 two months previous to the date of the accident, March 17, 1932, and allowing for depreciation we still are of the opinion that the claimant sustained a loss of approximately $400.00 in this regard by reason of the accident.
There were no minor children dependent on the wife at the time of her death. So far as the record reveals no children had been bom to the claimant, Brown, and the wife who was killed. They were in humble circumstances, with the claimant, Brown, earning at times as high as $120.00 per month, but we feel that a fair deduction from the testimony would indicate that his average income extending over a period of years would be seven or eight hundred dollars a year. The record does not show any loss of love or affection on the part of the children of the wife, Roxie M. Brown; in fact their whereabouts or addresses are not definitely known and none of them appeared before the court in support of the claim filed on behalf of their mother’s estate. Under these circumstances, feeling that the evidence warrants and impels an award to the Roxie M. Brown *9 estate, by reason of her wrongful death, we fix the amount of said award at two thousand dollars ($2,000.00) and recommend that the said sum be duly appropriated and paid to the administrator of the estate, upon the signing and execution of a proper release, relieving the state from any further liability or claim of any kind to the said Roxie M. Brown estate, by reason of the accident in question.
In the matter of the individual claim of James E. Brown, we feel that an award of four thousand dollars ($4,000.00), including the loss of the automobile, would be proper and adequate to compensate him for all injuries sustained, and we so find.
Judges Robert L. Bland and Walter M. Elswick both concur.